IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

HUMBERTO LAGAR,

                       Plaintiff,                         OPINION & ORDER

     v.

                                               13-cv-251-wmc

LIZZIE A. TEGELS, MYRON OLSON and
S. BARTON,

                       Defendants.

Plaintiff Humberto Lagar alleges that the defendants -- the warden, program manager and chaplain of Jackson Correctional Institution ("JCI") -- have all impinged on his religious freedom by denying him the right to wear a Rosicrucian emblem in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc.  Lagar also seeks a preliminary injunction directing defendants to allow him to wear the emblem.  (Dkt. #17.)  In turn, defendants have moved for summary judgment on Lagar's claims.  (Dkt. #23.)  For the reasons discussed below, the court will now grant that motion in its entirety.

UNDISPUTED FACTS

## I.  The Parties

Since September 7, 1995, plaintiff Humberto Lagar has been incarcerated in various inistitutions by the Wisconsin Department of Corrections ("DOC").  Relevant to his RLUIPA claims here, Lagar has been at JCI, a medium-security institution that houses approximately 1,000 inmates, since May 12, 2009.

Lagar is a confirmed Rosicrucian Student.  The parties dispute whether Lagar is also a gang member.  Lagar avers he is not, and points out that he has never received a conduct report for gang activity, nor does he have any marks or tattoos displaying any gang symbols. Defendants point out that Lagar's DOC-120 "face card" indicates affiliation with a "Security Threat Group" via the "Red G" symbol in the "Security Restrictions" box, and that Lagar has been identified in the Wisconsin Integrated Corrections System database since April 17, 1992 as being affiliated with the Latin Kings.  Lagar asserts that these DOC classifications are erroneous.

Defendant Lizzie Tegels is currently the Warden at JCI, a position she has held since December 2, 2012.  Defendant Myron Olson has been a Chaplain at JCI since October 7, 2001.  Defendant Scott Barton has been the Corrections Program Supervisor at JCI since February 28, 2011, but he has never been a member of the DOC's Religious Practices Advisory Committee, which is discussed further below.

## II. DOC Policy and Practice Surrounding Religion and Religious Emblems

### A. General Policies and Umbrella Religion Groups

DOC policy states that incarcerated inmates will have opportunities to pursue lawful practices of the religion of their choice, provided those practices are consistent with security practices and principles, rehabilitative goals, health and safety, allocation of limited resources, and the responsibilities and needs of the correctional institution and facilities. For instance, inmates may generally exercise their religious beliefs and practices through: (1) congregate services; (2) religious diet requests; (3) individual study; (4) personal meditation; (5) use of religious books and property; (6) celebration of religious feasts; (7) individual religious observance in their living quarters; (8) correspondence with fellow

believers; (9) pastoral visits; and (10) requests to abstain from work or program on days that call for religious observance.

The DOC has also implemented specific policies to ensure that incarcerated offenders have uniform opportunities to pursue lawful practices of the religion of their choice, including Division of Adult Institutions ("DAI") Policy 309.06.01. That policy establishes the concept of "umbrella religion groups" -- inclusive groups designed to appeal to a wide range of religious beliefs within a given faith community. As defined by DAI Policy 309.61.02, umbrella religion groups include Catholic, Eastern Religions, Islam, Jewish, Native American, Pagan and Protestant. The parties dispute whether inmates can also designate their religious preferences under the umbrella religious group "Humanist/Atheist/Agnostic."

To participate in the religious services or study groups associated with any of the designated umbrella religion groups under DAI Policy 309.06.01, an inmate must complete a DOC-1090 "Religious Preference" form, designating a religion within an umbrella group as his preference. Inmates may also check the box marked "Other" or "No preference" if they choose. An inmate may change his recorded religious preference once every six months via the DOC-1090.

## B. Religious Property Policies

All DOC inmates may obtain and possess personal property, although what constitutes "permissible property" varies from institution to institution depending on its specific safety considerations and treatment programs. An inmate's personal property may include religious personal property, such as religious emblems, headwear, prayer beads, rugs

3

or mats, musical instruments, traditional dress, oils, books, publications and symbolic food or drink.  The DOC permits inmates to possess any approved religious property associated with his or her designated religious preference, unless the item presents a threat to the order and safety of the institution.  In service of the latter consideration, all DOC correctional institutions are required to monitor and control authorized property in an inmate's possession, including religious property.  The DOC also (1) limits the total amount of inmate property allowed; (2) limits the sources and vendors for the acquisition of property; and (3) makes property items more uniform, again to promote its goal of safe, secure prison environments.

Given the hundreds of different religions practiced by Wisconsin inmates, the number of potential religious property items is large, and so DAI Policy 309.61.02 "Religious Property" serves as a guideline for correctional institutions, to ensure inmates have access to religious items as personal property and/or during approved umbrella religious group use.  In particular, DAI Policy 309.61.02 is a department-wide procedure applicable to all DOC adult correctional institutions, although each institution has authority to apply it consistent with its own specific security risks and concerns.  The policy includes an attachment entitled "Religious Property Chart," which specifies the property permitted for a particular Umbrella Religion Group and a description of the item.  All religious property items must comply with the restrictions set forth in that chart.

Unsurprisingly, a specific consideration underlying the restrictions in the Religious Property Chart is institutional security -- and even more specifically, preserving security by preventing gang activity.  Gangs threaten institution security both because of the potential for gang violence and because gangs undermine prison authority.  Indeed, gangs pose a

4

significant, specific threat to correctional officers and other security staff members, and their presence is detrimental generally to inmates, whose sense of security, safety and ability to concentrate on rehabilitation programs may all be affected.  Even gang members themselves are physically endangered by the presence of rival gangs, or rivalries within a gang, and their chances of rehabilitation are compromised because gangs tend toward antisocial behavior and criminal activity.  Because an institution's ability to manage gang activity will generally reduce the number of violent incidents in prison, it is considered imperative to maintaining a safe and secure environment for staff, inmates, visitors and the community alike.

In service of this goal, the institution prohibits inmates from wearing or displaying symbols that may indicate association, or at least affiliation, with a gang.  Perhaps trying to take advantage of protections under the First Amendment, gangs have a history of co-opting religious symbols in order to organize themselves and incite violence in prison.  Gangs may similarly seek legitimacy (or apparent legitimacy) by affiliating themselves with particular religious groups.  Certainly, in the DOC's view, allowing inmates to select unique emblems invites gangs to request and adopt the same emblem(s) under the guise of religious exercise, which is why requests for religious emblems must be confirmed as "religious" in nature and must use symbols that the designated religion generally recognizes as having significance.

Given this background, the parties agree that the DOC has a *compelling* interest in limiting the variety of symbols inmates may possess and in precluding inmates from displaying religious or secular property that identifies them with a gang or gangs.  The parties also agree that the DOC has insufficient staffing resources to review individual symbol requests from individual inmates to assess their security risks on a rolling basis.

Even so, not all symbols with gang connotations are prohibited.  In fact, the DOC specifically permits certain emblems that have, in the past, been employed by gangs as identifiers, including (1) a six-pointed star for those of the Jewish umbrella religion group; (2) a five-pointed star ("pentagram") for those of the Pagan umbrella religion group; and (3) a crucifix or cross for those of the Catholic and Protestant umbrella religion groups. However, the DOC prescribes the characteristics of permitted symbols in light of their history.  For instance, the approved Pagan pentagram consists of an upright five-pointed star with a circle around it, because gang members typically use *unenclosed* pentagrams. Likewise, equal-armed crosses are one of the most popular symbols for neo-Nazi and white supremacist groups, so DOC prohibits crosses and crucifixes with arms of equal length.

### C. Religious Practices Advisory Committee

The DOC created the Religious Practices Advisory Committee ("RPAC") to review inmate religious issues that arise within the DOC; consult with DOC staff and volunteers, members of community religious groups and the Wisconsin Department of Justice on religious issues; apply, review and suggest revisions to various DOC internal religious policies and procedures; and resolve religious issues occurring in adult correctional institutions so as to promote consistency and fairness within the Division of Adult Institutions and among various religious faiths.  With respect to religious property, RPAC takes the position that the DOC must distinguish between religious property "needs" and "wants," since allowing *all* religious property requests would be unmanageable.  Thus, RPAC consults with spiritual advisors to assess:  (1) whether requested religious property items are

necessary to practice a particular faith tradition; and (2) whether a practitioner may effectively honor the tenets of his faith without the item in question.

### D. Requesting New Religious Practices

Under DAI Policy 309.61.01, inmates may request approval of a new religious practice or activity, or approval of a new religious property item, by submitting a "Request for New Religious Practice" form DOC-2075.  This form is available to inmates through an institution's chaplain/designee or chapel.  DAI relies on an inmate's submission of the DOC-2075 to bring any new religious issues before RPAC for investigation.

To make such a request, an inmate must submit the DOC-2075 to that institution's chaplain.  The chaplain initially reviews the request and makes a recommendation to RPAC, as does the Corrections Program Supervisor.  They then forward the request to RPAC, whose members collaborate and review the request and make their own recommendation in turn.  Ultimately, RPAC forwards the request to the Warden, who makes a final decision based on the prior recommendations.  If the Warden ultimately denies the request, the inmate may appeal via the Inmate Complaint Review System ("ICRS").

### III. Lagar's Request for a Rosicrucian Emblem

Sometime in 2010, Lagar's father directed him toward Rosicrucian Philosophical Teachings.  In 2011, Lagar became an established Rosicrucian Student.[1]  Lagar's Rosicrucian beliefs are a form of esoteric Christianity:  Rosicrucians study the Bible and believe in Jesus Christ.  Lagar is the only Rosicrucian Student at JCI.

---

[1] Apparently, however, Lagar was classified as Catholic during the relevant time period, based on DOC-1090 forms he submitted throughout his incarceration,  Lagar has never submitted a DOC-1090 changing his umbrella religion group, although he indicates that he attempted to change it to "other" via his Request for New Religious Practices form.

On September 4, 2012, during Lagar's second year of study, he wrote to Olson to obtain a Rosicrucian emblem.  The emblem consists of a five-pointed star without a circle around it, a Christian cross and seven roses arranged around the cross; it is not currently listed as authorized on the Religious Property Chart for any umbrella religion group.  Lagar acknowledges that the emblem is "dominated" by a pentagram, which is known to represent People's-nation affiliated gangs.  He also does not dispute that if he were permitted to possess the emblem, it would be a "unique and individualized" emblem that no other inmate could possess.

Olson denied the request on September 8, stating, "I'm sorry, but a Rosicrucian necklace would not be allowed per DOC policy on approved emblems.  If you want I could talk to you about which ones you could have.  Have a good day!"  On September 10, 2012, Lagar sent a second brief letter to Olson.  The letter stated:

> [T]he Rosicrucian Philosophy is recognized by the United States Constitution.  This Philosophy is based on the Mystical aspect of Christianity; therefore, I should not be prohibited to be allowed its emblem.  [I have] been studying these esoteric teachings for quite [some time] now.  It is because of these enlightened teachings that I know Christ.  My heart is here, in the Christian Faith, which was made clear to me by way of the Rosicrucian Teachings.

(*See* Mot. Prelim. Inj. Ex. C (dkt. #17-1) 3.)  In that letter, Lagar also asked for the policy that prohibited the Rosicrucian emblem, or for Olson to let him know if Olson was the one rejecting his request.  In response, Olson sent him a copy of the Religious Property Chart.[2]

On September 17, 2012, Lagar wrote to the "Warden/Deputy Warden" to advise that he was being denied the Rosicrucian emblem and to ask permission to have one sent to

---

[2] The chart has since been updated, but the permissible religious emblems for the Catholic umbrella religion group have not changed.

him.  (*Id.* at Ex. D (dkt. #17-1) 6.)  On September 20, Lagar received a letter from then

acting Warden, Judy P. Smith, which stated:

> I am in receipt of your letter requesting an emblem from the
> Rosicrucian Philosophy based on the Mystical Teachings of
> Christianity be allowed to be sent to you.  You state in your
> letter that Chaplain Olson has denied this request based on DAI
> Policy 309.61.02 Religious Property.  If you wish to request a
> religious practice or activity that is not recognized by this policy
> you can request such by filling out DOC2075 Request for a New
> Religious Practice.  The form requests a detailed description of
> the religious practice or activity you wish to participate in.

(*Id.* at Ex. E (dkt. #17-1) 7.)

As directed, Lagar submitted a DOC-2075 form to the Chapel, requesting that he be

allowed to wear a Rosicrucian emblem.  In turn, Chaplain Olson recommended denial of the

request based on his opinion that Policy 309.61.02 already met the religious emblems needs

of Protestant inmate populations.  Barton, JCI's Program Supervisor, agreed with Olson's

recommendation; he also noticed that Lagar's religious preference was listed as Catholic and

believed that Lagar had already been told he could have one of the three approved emblems

from the religious property chart for that faith.  Barton then forwarded Lagar's DOC-2075

to RPAC.

RPAC recommended that Lagar's request be denied on December 17, 2012.  RPAC

set forth the following rationale for its determination:

> There is a history throughout the national corrections and law
> enforcement community demonstrating that a number of
> religious symbols have been co-opted by gangs and racially-
> motivated hate groups for the purposes of organizing and
> inciting violence and/or other illegal behaviors in the
> institutions.  Therefore DOC has a compelling state interest in
> limiting variety of symbols inmates may possess and in
> precluding inmates from displaying religious or secular property
> which identifies them with any group.  DOC has insufficient

> staffing resources to review diverse, individualistic symbol requests from over 20,000 inmates to preclude security threat group implications.   Furthermore, space limitations preclude DOC from accommodating religious property preferences (rather than necessities) of the large inmate population in 35 correctional facilities.
>
> The Rosicrucian emblem requested by Mr. Lagar is dominated by a five-pointed star, which is known to represent People's nation-affiliated gangs, including Bloods and Vice Lords. Because Mr. Lagar's religious preference is recorded in WICS as Catholic, he has the opportunity to obtain one of three approved emblems.

Kelli R. Willard West, the Religious Practices Coordinator and RPAC Chair, signed this recommendation and forwarded it to Tegels for her final review and decision.

Tegels ultimately denied Lagar's DOC-2075 on December 28, 2012, relying on the expertise of Olson, Barton and RPAC.  Lagar received a letter from Olson on January 16, 2013, which informed him that his

> request has been denied.  DAI 309.61.02 establishes approved religious property for inmates in each of the seven Umbrella Religion Groups.  With guidance [from] the Religious Practices Advisory Committee, advisors representing the seven Umbrella Groups.   Property is approved based upon the minimum requirements for the inmates to effectively practice their faith.
>
> Because you[r] religious preference is recorded as Catholic, you have the opportunity to obtain one of the three approved emblems for that faith group.

(*Id.* at Ex. F (dkt. #17-1) 8.)

On January 17, 2013, Lagar wrote a brief letter to Olson, explaining that he was not a Catholic and asking that his records reflect that he was a Rosicrucian.  His letter also suggested that DOC policy be amended to acknowledge Rosicrucian Teachings and to permit Lagar to have a Rosicrucian emblem.  The letter did not ask that Olson respond, nor did it include any questions for Olson to answer.  That same day, Lagar wrote a separate

letter to Attorney General J.B. Van Hollen to bring to his attention the denial of the Rosicrucian emblem and place him on notice of a possible lawsuit.

On January 29, 2013, Lagar filed complaint JCI-2013-2121 against Olson for his failure to respond to Lagar's letter of January 17.   On February 1, Institution Complaint Examiner ("ICE") Jodi Dougherty recommended that the complaint be dismissed.   Warden Tegels accepted this recommendation on February 15.   Two days later, Lagar appealed the dismissal to Corrections Complaint Examiner ("CCE") Charles Faktor, who recommended it be dismissed on February 21, which it was formally on February 27.

On February 24, Lagar wrote Olson another letter regarding the denial of the Rosicrucian emblem.   He challenged Olson's reasoning that the emblem was dominated by a five-pointed star, a symbol known to represent People's nation-affiliated gangs:

> If this is true, then why does this institution [] allow[] a Pentagram (a five-pointed star in the upright position) for Pagan Religious Practices?   I suggest that you and the rest of those behind the scene, within the R.P.A.C., stop violating my 1st Amendment Right to Freedom of Religion and allow me the Rosicrucian Emblem or I'm going to bring this unjust issue to Federal Court.

Lagar received an Interview/Information Request from Olson in response to this letter on March 2, in which Olson instructed Lagar to appeal the decision of the RPAC if he believed that it was a mistake.

The next day, Lagar wrote another letter to Olson, stating again that the decision to deny him the Rosicrucian emblem violated his First Amendment rights.   Lagar denied affiliation with any People's nation-affiliated gangs.   He further stated he was not a Catholic, and that he had been a practicing Rosicrucian Student for about three years.   The letter also reiterated that inmates under the Pagan umbrella religion group were permitted

11

upright pentagrams, which were also gang symbols, and ended with the words, "Please respond."  On March 19, Olson responded, stating, "As I had already expressed to you, there are steps to take if you do not feel that [the] Religious Advisory Committee was fair in [the] decision that was made in regards to your DOC-2075[.]"

Lagar wrote back on March 19, stating that he wanted to take the necessary steps to have the Rosicrucian emblem approved.  His letter also stated:

> The Religious Advisory Committee was definitely not fair when it came down to acknowledging the fact that I too have the Right to worship God how I wish.  I have already seen the DAI Policy 309.61.02 and it does not include any one emblem for the Rosicrucian Symbol.  Please, we must come to a reasonable and just resolution.  I understand these policies, however, these policies are neglecting my Rights as a Rosicrucian.

Olson responded on March 25, stating that the DOC-2075 request had already been reviewed and denied by the RPAC, the Program Supervisor, the Warden and Olson himself and that it would not be reviewed again.  For the *third time*, Olson also reminded Lagar that he could appeal the denial through the ICRS.  Olson specifically directed him to the policy set forth at page five of DAI Policy 309.61.02.  Finally, Olson indicated that he would not respond again to correspondence on the topic of Lagar's request, sending a copy of this final response to Barton and the ICE as well.

On March 31, Lagar filed a five-page complaint seeking to be allowed to have the Rosicrucian emblem within JCI and all other DOC facilities.  An Institution Complaint Examiner, Jodi Dougherty, acknowledged the complaint on April 2.  Two days later, on April 4, Dougherty rejected the complaint because Lagar's request had previously been addressed through the ICRS.

OPINION

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In ruling on a motion for summary judgment, the court views all facts and draws all inferences in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the initial burden is met, for an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion.  *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Id.* at 323.  As set forth below, there really are no *material* disputes of fact on this record, and so defendants are entitled to judgment as a matter of law.

13

## I.  RLUIPA Claim

RLUIPA prohibits the government from imposing a substantial burden on the religious exercise of a person residing in or confined to an institution unless the burden furthers a compelling governmental interest through the least restrictive means.  *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005) (quoting 42 U.S.C. § 2000cc-1(a)(1)-(2)).  "[T]he plaintiff bears the initial burden of showing (1) that he seeks to engage in an exercise of religion, and (2) that the challenged practice substantially burdens that exercise of religion."  *Koger v. Bryan*, 523 F.3d 789, 796 (7th Cir. 2008).  Once a plaintiff has established that prima facie case, the burden shifts to defendants, who must show that their practice is the least restrictive way of furthering a compelling governmental interest.  *Id.*

With respect to Lagar's prima facie case, defendants do not materially dispute that Lagar sought to engage in an "exercise of religion" under RLUIPA.  Thus, Lagar need only show that by denying Lagar his Rosicrucian emblem, defendants imposed a "substantial burden" on the exercise of his religion.  In the context of RLUIPA, a "regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."  *Koger*, 523 F.3d at 799 (quoting *Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003)).

Here, Lagar neither proposes findings of fact regarding the importance of the emblem to the practice of the Rosicrucian Teachings, nor does his affidavit (dkt. #36) even suggest its importance.  While the court is under no obligation to consider arguments advanced only in a brief, *see Outlaw v. Newkirk*, 259 F.3d 833, 839 n.2 (7th Cir. 2001), Lagar's brief in opposition to summary judgment does at least touch on this point, representing that the

Rosicrucian emblem "contains the key to man's past evolution, his present condition and future development, together with the method of attainment," and that it "assists in the process of empowering one's higher self" by directing the wearer's focus toward spiritual, rather than material, purposes.  (*See* Pl.'s Br. Opp'n Summ. J. (dkt. #33) 5.)

Under Seventh Circuit precedent, it is questionable at best whether Lagar's statements, without more, create a material dispute of fact as to whether defendants have substantially burdened his religious exercise.  For example, in *Borzych v. Frank*, 439 F.3d 388 (7th Cir. 2006), the court considered the RLUIPA claim of an inmate who contended that he needed particular books to practice his religion of Odinism.  This court assumed without deciding that denying Borzych the books he wanted substantially burdened the exercise of his religion before granting defendants summary judgment on other grounds.  *See Borzych v. Frank*, No. 04-C-0632-C, 2005 WL 2206785, at *12 (W.D. Wis. Sep. 9, 2005).   The Seventh Circuit, in reviewing that decision, stated:

> We doubt that keeping these books out of the prison substantially burdens anyone's religious exercise.  Borzych's only evidence on this point is his unreasoned say-so, plus equivalent declarations by other inmates.  This is insufficient to create a material dispute that would require a trial. . . . No objective evidence supports his assertion that the books are important to Odinism.

*Borzych*, 439 F.3d at 390 (internal citation omitted).  Insofar as Lagar has presented no "objective evidence" that denial of the Rosicrucian emblem renders him effectively unable to exercise his religion, this case is similar to *Borzych,* and thus Lagar appears to have failed to establish a prima facie case under RLUIPA.[3]  *See also Kaufman v. Pugh*, 733 F.3d 692, 699

---

[3] At least one district court has found that denial of a particular religious emblem *did* constitute a substantial burden on religious exercise, based on its conclusions that "[w]earing a Celtic Cross necklace is a religious exercise" and "[d]enying [the inmate] a Celtic Cross necklace was directly,

(7th Cir. 2013) (inability to wear a unique "knowledge thought ring" did not impose a substantial burden on inmate's ability to practice atheism) [hereinafter *Pugh*].

Even if the court presumes that denial of the Rosicrucian emblem has substantially burdened Lagar's religious exercise, defendants have offered largely undisputed proof that denying the emblem under DAI Policy 309.61.02, is the least restrictive means of (1) maintaining institutional security and (2) quelling gang activity, both of which are undoubtedly compelling governmental interests.  *See, e.g.*, *Borzych*, 439 F.3d at 391 ("An interest in curtailing violence within prison walls is compelling."); *Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir. 1987) ("Equally compelling [as a need for security, order and

---

primarily, and fundamentally responsible for rendering that religious exercise effectively impracticable." *Rowe v. Davis*, 373 F. Supp. 2d 822, 827 (N.D. Ind. 2005).  RLUIPA itself appears to leave open the possibility of that interpretation by defining "religious exercise" to "include any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7).  On the other hand, this exceedingly broad interpretation would render largely meaningless the requirement that a plaintiff *show* a substantial burden, since prohibiting any individual act or item would obviously render impracticable particular practices involving that act or item.  Indeed, the Seventh Circuit has recognized as such in the land use context:

> [T]he meaning of 'substantial burden on religious exercise' could be read to include the effect of any regulation that 'inhibits or constrains the use, building, or conversion of real property for the purpose of religious exercise.' . . . However, this cannot be the correct construction of 'substantial burden on religious exercise' under RLUIPA.  Application of the substantial burden provision to a regulation inhibiting or constraining *any* religious exercise, including the use of property for religious purposes, would render meaningless the word 'substantial,' because the slightest obstacle to religious exercise incidental to the regulation of land use – however minor the burden it were to impose – could then constitute a burden sufficient to trigger RLUIPA's requirement that the regulation advance a compelling governmental interest by the least restrictive means.

*Civil Liberties for Urban Believers v. City of Chi.*, 342 F.3d 752, 761 (7th Cir. 2003) (emphasis in original).  In light of this holding, and given that the Seventh Circuit has adopted the *Civil Liberties* definition of "substantial burden" in the context of inmate claims, as well as land use cases, *see Koger*, 523 F.3d at 799, the court respectfully disagrees with the *Rowe* court, which may have been overly generous in applying the "substantial burden" requirement.  In an event, the only "proof" here of the importance of the Rosicrucian emblem to the exercise of Lagar's religion is his own conclusory statement, which is insufficient by itself to meet his burden of proof.

16

discipline] and inexorably related is the need to contain and eliminate prison gangs whenever possible.  Indeed, it is difficult to conceive of a single factor more detrimental to penological objectives than organized gang activity.").

Specifically, defendants have offered uncontroverted evidence that restricting the number of permissible religious emblems for the practice of the myriad religions within the prison population furthers both of these compelling interests.  They offer the testimony of Peter Jaeger, a DOC employee of seventeen years and the co-chair of RPAC, to explain:  (1) how gangs frequently co-opt religious symbols as identifiers; (2) why distinctive symbols are more attractive to gang members than standardized or common symbols; and (3) why identifiers may disrupt institutional security and lead to gang violence.  (*See* Peter Jaeger Aff. (dkt. #27) ¶¶ 24-29.)   Timothy O. Burlingame, a JCI lieutenant with training in the identification and operation of prison and street gangs, has also testified as to the detrimental effect of gangs in prisons and the potential dangers of allowing Lagar to possess a unique religious emblem.  (*See* Timothy O. Burlingame Aff. (dkt. #30).)

Not only does the court owe deference to the institutional officials' expertise in security matters, *see Cutter*, 544 U.S. at 725 n.13, Lagar has presented no admissible evidence placing their testimony into dispute.  Nor does Lagar suggest a less restrictive alternative to this policy, nor can the court conceive of any, at least where it is undisputed that the DOC lacks sufficient staff or resources to assess individual symbols and emblems to determine on a case-by-case basis whether they are potentially risky, or for that matter, essential to the practice of a specific religion.  *Cf. Borzych*, 439 F.3d at 391 (finding that redacting objectionable passages in books, rather than banning the books altogether, was "not a realistic option").  Indeed, in considering a different restriction on religious emblems

17

in prison, the Seventh Circuit has recognized that the DOC "is entitled to draw a distinction between, on the one hand, religious emblems that are common to the members of other umbrella religious groups, easy to recognize, and difficult to abuse as a gang symbol, and on the other hand, emblems that are unique to each prisoner and potential security risks." *Pugh*, 733 F.3d at 699.  While the court made that statement in the context of its Establishment Clause analysis, not RLUIPA, the reasoning would seem equally applicable to establishing that defendants' decision to deny Lagar the Rosicrucian emblem was permissible under RLUIPA.

Lagar advances two arguments in an attempt to overcome defendants' showing, although neither is particularly relevant.  *First,* Lagar contends that he is not a gang member, a fact that *is* in dispute.  Whether Lagar himself may be a gang member, however, does not negate the security risks of granting him an individualized emblem.  On the contrary, defendants offered undisputed testimony that the distinctiveness of the Rosicrucian emblem, coupled with the fact that its unique composition includes an unenclosed pentagram (admittedly a gang identifier), is enough to put Lagar at risk of violence from other inmates who may *believe* him to be a gang member and to compromise institutional security.  (*See* Peter Jaeger Aff. (dkt. #27) ¶ 27.)  Additionally, there is no dispute that permitting Lagar (or any other inmate) to display a distinctive emblem would inspire other groups to demand the same sort of individualized accommodations, just as they have done in the past.  (*See* Defs.' Reply DPFOF (dkt. #38) ¶ 95.)

*Second*, Lagar points out that DAI Policy 309.61.02 permits members of other umbrella religion groups to possess emblems that are also associated with gang membership.  For instance, members of the Pagan umbrella religion group may possess pentagrams, and

members of the Catholic and Protestant umbrella religion groups may possess crucifixes or crosses. Here, too, defendants have produced evidence in the form of an uncontroverted expert affidavit that because the approved pentagram is available to the entire Pagan umbrella religion group, the emblem has lost its distinctive quality and much of its attractiveness to gang members. (*See* Peter Jaeger Aff. (dkt. #27) ¶ 31.) Likewise, the crucifixes and crosses permitted under DAI Policy 309.61.02 are available to all members of the Catholic and Protestant umbrella religion groups, effacing any distinctive quality they might have otherwise possessed. (*See id.* at Ex. 101 (dkt. #27-2) 1-2.) Moreover, standardization of the approved pentagram, crucifix and cross prevents inmates from customizing those religious symbols to reflect gang membership. (*Id.* (dkt. #27) at ¶¶ 22, 32.)

In contrast, the Rosicrucian emblem Lagar has requested lacks any of these safeguards. Unlike the approved religious emblems, it would be unique -- Lagar is the only practicing Rosicrucian Student at JCI, and the Rosicrucian emblem is not permissible under DAI Policy 309.61.02 for *any* other inmate, regardless of his umbrella religion group.[4] Accordingly, Lagar's claim under RLUIPA cannot survive summary judgment.

---

[4] This also distinguishes the present case from *Shatner v. Page*, No. 00-0251-DRH, 2009 WL 260788, at *29-31 (S.D. Ill. Feb. 4, 2009), on which Lagar relies. In *Shatner*, the inmate, a member of the Rosicrucian Fellowship, requested an enclosed five-point star, or pentagram -- a symbol permitted by the Illinois DOC and actually possessed by other inmates. The fact that other inmates had pentagrams undermined defendants' argument that Shatner's request implicated security interests. *Id.* at *31. In contrast, here, Lagar requests an emblem unique to him that is not permitted by DOC policy, and there is no suggestion in the record that other inmates possess this or any other distinctive, non-standardized religious emblem.

## II. Free Exercise Clause

The court also granted Lagar leave to proceed on a First Amendment Free Exercise claim.  "The protections offered by the First Amendment are more limited than those extended under RLUIPA."  *Mark v. Gustafson*, 482 F. Supp. 2d 1084, 1090 (W.D. Wis. 2006).  Traditional First Amendment jurisprudence protects only the observation of *central* religious beliefs, while RLUIPA protects religious exercise.  *Id.*  Unlike RLUIPA, the First Amendment also allows states to enforce neutral laws of general applicability even when they significantly burden religious practices.  *See Borzych,* 439 F.3d at 390; *Kaufman v. Schneiter*, 474 F. Supp. 2d 1014, 1025 (W.D. Wis. 2007).  Given these principles, this court has recognized on multiple occasions that a claim incapable of proceeding under the heightened protections RLUIPA will inevitably fail under the First Amendment as well.  *See, e.g.*, *Schneiter,* 474 F. Supp. 2d at 1025; *Mark*, 482 F. Supp. 2d at 1090; *see also Borzych*, 439 F.3d at 390 (declining to discuss the Constitution further when inmate's claim failed under RLUIPA).  This principle holds true here:  Lagar has produced no evidence that the Rosicrucian emblem is central to his religious practice, nor has he shown that defendants were applying their policy on religious emblems in a discriminatory manner.  As discussed above, defendants have also amply demonstrated that their interest in stifling gang activity is a legitimate, penological one justifying the limitations on religious emblems inmates may possess.  *See Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005) ("an inmate is not entitled to follow every aspect of his religion; the prison may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious interests").  For all these reasons, defendants are entitled to summary judgment on Lagar's First Amendment Free Exercise claim as well.

### III. Establishment Clause

Finally, defendants have moved for summary judgment on Lagar's remaining claim under the Establishment Clause. The Establishment Clause prohibits the government from favoring one religion over another without a legitimate secular reason. *Pugh*, 733 F.3d at 696. As previously noted, the Seventh Circuit already concluded in *Pugh* that the DOC's "control of religious emblems" serves legitimate security interests consistent with the Establishment Clause. *Id.* at 699; *see also Kaufman v. Karlen*, 270 F. App'x 442, 445 (7th Cir. 2008) ("[W]e agree with the district court that the policy has a valid secular purpose – ensuring that symbols do not identify prisoners with gangs or other non-religious separatist groups – without excessively entangling with any religion or advancing religion.").

In fairness, Lagar attempts to distinguish *Pugh* in that the plaintiff wanted a symbol, a "knowledge thought ring" in that case, which he conceded was *not* common to his chosen group of atheists. 733 F.3d at 699. In contrast, Lagar appears to argue, the Rosicrucian emblem *is* recognized among Rosicrucian students. The problem for Lagar is that the decision in *Pugh* upholding the DOC's policy did not turn on this factual distinction. Rather, the Seventh Circuit held that DOC was "entitled to draw a distinction between, on the one hand, religious emblems that are common to the members of other *umbrella religious groups*, *easy to recognize*, and difficult to abuse as a gang symbol, and on the other hand, emblems that are unique to each prisoner" and potential security risks. *Id.* (emphasis added). Like the "knowledge thought ring" in *Pugh*, the Rosicrucian emblem Lagar requests is not common to members of any of the umbrella religion groups that the DOC recognizes, nor has Lagar presented any evidence that it is "easy to recognize." Thus, while other Rosicrucian students might understand what the emblem represents, Lagar's possession of

21

the emblem among a general prison population presents essentially the same security concerns.  The court accordingly concludes that *Pugh* controls here, and defendants are entitled to summary judgment on Lagar's Establishment Clause claim as well.[5]

ORDER

IT IS ORDERED that:

1) Plaintiff Humberto Lagar's motion for preliminary injunction (dkt. #17) is DENIED.

2) Defendants' motion for summary judgment (dkt. #23) is GRANTED.  The clerk of court is directed to enter judgment and close this case.

3) Defendants' motion to stay the deadlines in the scheduling order (dkt. #43) is DENIED as moot.

Entered this 20th day of March, 2015.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[5] Because defendants have prevailed at summary judgment on all of Lagar's claims, Lagar's motion for a preliminary injunction (dkt. #17) is necessarily denied.